James E. OLIVER, Appellant,

v.

UNITED STATES, Appellee.

No. 90–CF–184.

District of Columbia Court of Appeals.

Argued Nov. 1, 1990.

Decided Jan. 8, 1993.

As Amended April 19, 1993.

---

Thomas T. Heslep, Lexington, VA, appointed by this court, for appellant.

John G. Horan, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Elizabeth Trosman, and Eva Polin, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before FARRELL and WAGNER, Associate Judges, and NEWMAN, Senior Judge.

NEWMAN, Senior Judge:

James Oliver ("Oliver") was charged with possession of cocaine with intent to distribute; after a bench trial, he was convicted. Oliver challenges the trial court's denial of his pre-trial motion to suppress evidence (cocaine) seized pursuant to a search which he contends was unconstitutional. In light of his previous encounter at Union Station with the same group of drug interdiction detectives, Oliver argues, his consent to the body search in this case was involuntary and thus invalid. On the particular facts of this case, we agree and therefore reverse the conviction.

On July 12, 1989, Metropolitan Police Department Detectives Donald Zattau, Edward Hanson, Edward Curley, and John Centrella, and Sergeant John Brennan were assigned to a drug interdiction team at Union Station. The detectives wore plain clothes. They were armed, but their weapons and handcuffs were concealed beneath their jackets. Oliver arrived at Union Station by train from New York. He carried no luggage, walked with his hands

in his pockets, and was observed looking off to his right.[1] Detective Zattau approached Oliver, showed Oliver his badge, and asked to talk to Oliver. Detective Hanson positioned himself to Oliver's right, about fifteen feet away, and Detective Centrella stood to Oliver's rear at about the same distance. At this time, Sergeant Brennan and Detective Curley were interviewing another individual. Detective Zattau proceeded to interview Oliver.[2] When asked if he was carrying weapons, drugs, or other contraband, Oliver replied that he was not. Based on Detective Zattau's testimony, the trial court found that Oliver consented to a pat-down search.[3] During the pat-down, Detective Zattau felt a "hard, lumpy substance in [Oliver's] crotch area." When asked what it was, Oliver replied that it was part of a colostomy bag. Oliver raised up his shirt and revealed an opening near his naval, from which a rubber tube extended downward.[4] Detective Zattau asked to see the colostomy bag, and suggested that they continue the search in a men's room nearby. Oliver walked into the men's room first, followed by Zattau and two other police officers, who stood behind Oliver by the door. Once inside the men's room, Oliver pulled the tube upwards. Zattau asked again about the

bulge in the crotch area. When Oliver started to loosen the drawstring waist of his pants, Zattau said, "do you mind if I do that?"[5] Oliver dropped his hands to his sides. Zattau pulled Oliver's pants away from his body, and observed a jock strap worn over boxer shorts. Zattau reached into the jock strap and pulled out a clear powder-filled plastic bag later determined to contain 125 grams of cocaine. Oliver was arrested.

At the suppression hearing, in response to counsel's questions regarding whether Oliver felt free to leave the detectives, Oliver testified that he was not free to leave from the moment of Detective Zattau's initial approach, because that detective had stopped Oliver on a previous occasion. According to Oliver, one to two months before the instant encounter leading to his conviction, he and a companion were approached by Detective Zattau at the taxi stand in front of Union Station. The questioning was substantially similar to the encounter of July 12, 1989. Detective Zattau asked to search the bag Oliver was carrying. When Oliver refused, Zattau replied that Oliver could leave, but that his luggage must remain. Oliver agreed to the search of the bag. No drugs were found. Oliver began to walk away, but Zattau said he had to

---

1. Drug interdiction detectives pay special attention to this type of behavior, especially when the observed individual disembarks from a train or bus from New York.

   For example, in *United States v. Winston*, 282 U.S.App.D.C. 96, 101, 892 F.2d 112, 117 (1989), *aff'd*, 283 U.S.App.D.C. 85, 896 F.2d 1383, *cert. denied*, 498 U.S. 830, 111 S.Ct. 91, 112 L.Ed.2d 63 (1990), detectives approached a man who walked at a very slow pace through the Greyhound–Trailways bus terminal, looking around as if he were searching for someone. The appellants in *United States v. Lloyd*, 276 U.S.App. D.C. 118, 120, 868 F.2d 447, 449 (1989) were observed leaving the "Night Owl" train from New York, walking to the center of the Union Station concourse, stopping, looking around, and returning to a seating area. After lounging for twenty minutes, they walked to the taxi stand.

   In *Guadalupe v. United States*, 585 A.2d 1348, 1349 n. 1 (D.C.1991), Sergeant Brennan testified that drug interdiction detectives watch for "activities such as people splitting up, coming in, going right to the telephone, looking around the

station in a suspicious manner, doing suspicious things." *Id.*

2. The interview consisted of several questions. Detective Zattau inquired into Oliver's recent arrival by train, reasons for his visit to Washington and his place of residence. Oliver produced his train ticket upon request.

3. Contrary to Detective Zattau's account, Oliver testified that Detective Zattau did not seek his consent before beginning the pat-down search.

4. Oliver explained that the bulge Zattau felt was the colostomy bag. He came to Washington for further medical treatment of a gunshot wound giving rise to the need for the colostomy bag.

5. At the suppression hearing, Detective Zattau expressed his concern that Oliver carried a weapon concealed in his pants, and for that reason proceeded to reach for Oliver's pants himself. The trial court found that safety concerns did not justify a frisk under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The trial court also found that the detectives lacked articulable suspicion that Oliver carried drugs on his person.

search Oliver's person also or have the dog sniff him. Oliver's companion, impatient to leave, encouraged Oliver to allow the search. No drugs were found. Detective Hanson also testified at the suppression hearing, and corroborated much of Oliver's account of the previous encounter, except that he stated the questioning and search of Oliver had been done by Detective Curley.

The trial court credited Oliver's testimony regarding the previous encounter. Of key importance to our decision, the judge made two findings. First, he found that Oliver had in fact believed (mistakenly but understandably) that Detective Zattau was the same person who had questioned and searched him on both occasions.[6] Second, the court found that the prior search of Oliver's person had been conducted against his will. Both findings are relevant in determining whether Oliver freely consented to the body search on July 12, 1989. Despite the previous encounter, the trial court found that on the present occasion Oliver voluntarily consented to the pat-down and the more intrusive search of his body that followed.

■ The instant case turns on the issue of consent, as the trial court properly found. A seizure does not occur simply because police officers approach an individual and ask a few questions. *Florida v. Bostick*, —— U.S. ——, ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991); *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983) (plurality opinion); *Richardson v. United States*, 520 A.2d 692, 696 (D.C.), *cert. denied*, 484 U.S. 917, 108 S.Ct. 267, 98 L.Ed.2d 224 (1987); *United States v. Barnes*, 496 A.2d 1040, 1044–45 (D.C.1985). This is so even where the officers lack articulable suspicion that

the interviewee has committed a crime. *Bostick, supra,* —— U.S. at ——, 111 S.Ct. at 2386; *Immigration & Naturalization Service v. Delgado,* 466 U.S. 210, 216–17, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984). The test is whether a reasonable person, innocent of any crime, in light of the objective surrounding circumstances, would have believed that he was "at liberty to ignore the police presence and go about his business." *Bostick, supra,* —— U.S. at ——, 111 S.Ct. at 2387; *Michigan v. Chesternut,* 486 U.S. 567, 573, 574, 108 S.Ct. 1975, 1979, 1980, 100 L.Ed.2d 565 (1988); *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, ——, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.), *reh'g denied,* 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138 (1980). Fourth Amendment protections against unreasonable seizures are not implicated until the encounter loses its consensual nature. *Bostick, supra,* —— U.S. at ——, 111 S.Ct. at 2386; *Kelly v. United States,* 580 A.2d 1282, 1286 (D.C.1990).

■ Recent cases in this jurisdiction support our conclusion that Oliver was not seized at the moment he was approached by the drug interdiction detectives and asked questions. *See, e.g., Kelly, supra,* 580 A.2d at 1288; *Winston, supra* note 1, 282 U.S.App.D.C. at 101, 892 F.2d at 117. He involved himself in a consensual discussion, from which he was free to extricate himself at any moment. *Kelly, supra,* 580 A.2d at 1288. Present in Oliver's situation were factors which negate intimidation or coercion.[7]

The drug interdiction team members were dressed in plain clothes, not uniforms. Their weapons and handcuffs were concealed beneath jackets; at no time during the questioning or search did the detectives

---

6. Notwithstanding Detective Hanson's testimony that Detective Curley had questioned and searched Oliver the first time, the trial judge noted the similarity in appearance between Hanson and Zattau, and found (a) that Hanson had done the questioning on the first occasion, but that (b) Oliver mistakenly (though plausibly) believed it had been Zattau who questioned and searched him. There was also testimony, however, that Zattau and Curley resembled one another.

7. These same factors are also considered in evaluating the voluntariness of consent to searches. *See United States v. Caballero,* 290 U.S.App.D.C. 235, 240, 936 F.2d 1292, 1297 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 943, 117 L.Ed.2d 113 (1992); *United States v. Maragh,* 282 U.S.App.D.C. 256, 261, 894 F.2d 415, 420, *cert. denied,* 498 U.S. 880, 111 S.Ct. 214, 112 L.Ed.2d 174 (1990), *on remand,* 756 F.Supp. 18 (D.D.C.1991).

brandish a weapon. The detectives spoke in conversational tones and conducted themselves in a polite manner. Though there were four detectives present, they did not appear to crowd Oliver. Detective Zattau testified that the other detectives stood fifteen feet away from Oliver and did not block his path while Zattau conducted the interview. Thus, there was no Fourth Amendment intrusion on appellant's liberty or privacy before the police laid hands on his person.

■ The government concedes, however, as it must, that when the police patted Oliver down, they "searched" him for purposes of the Fourth Amendment, and that that intrusion (as well as the subsequent more invasive search) requires justification. Specifically, a search conducted without a warrant is *per se* unreasonable unless it falls within one of the few established exceptions. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). Voluntary consent is such an exception. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2044, 36 L.Ed.2d 854 (1973). The voluntariness of consent is determined by careful scrutiny of all circumstances surrounding the search. *Id.* at 226, 93 S.Ct. at 2047. Whether the suspect acts in his own best interest is not relevant to the determination of voluntary consent. *Mendenhall, supra,* 446 U.S. at 559, 100 S.Ct. at 1880. Consent may be freely given even if the officers requesting the search fail to advise a suspect of his right to withhold consent. *Id.* at 558, 100 S.Ct. at 1879. "Knowledge of the right to refuse is not a prerequisite of a voluntary consent," *Schneckloth, supra,* 412 U.S. at 234, 93 S.Ct. at 2051, although it may be "highly relevant." *Mendenhall, supra,* 446 U.S. at 559, 100 S.Ct. at 1879. The government bears the burden of proving voluntary consent by a preponderance of the evidence. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968); *United States v. Matlock*, 415 U.S. 164, 178 n. 14 (1974).

Mere submission to a show of authority does not satisfy the government's burden of proof. *Royer, supra,* 460 U.S. at 497, 103 S.Ct. at 1324.

■ A finding of voluntariness is essentially factual. On appeal our review is limited: a trial court's finding that a search is consensual is upheld unless such a finding is clearly erroneous. *United States v. Alexander*, 428 A.2d 42, 49–50 (D.C.1981); *Childress v. United States*, 381 A.2d 614, 618 (D.C.1977). Recent cases decided by the United States Court of Appeals for the District of Columbia Circuit have upheld consent to searches of bags, and to body searches conducted by drug interdiction teams at Union Station and the local Greyhound bus terminal. However, several of those opinions specifically noted the *absence* of factors or circumstances considered coercive. *See, e.g., Lloyd, supra* note 1, 276 U.S.App.D.C. at 122, 868 F.2d at 451; *Maragh, supra* note 7, 282 U.S.App.D.C. at 258, 894 F.2d at 417.

■ In determining from the totality of the circumstances whether consent to a search is voluntary, "account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Schneckloth, supra,* 412 U.S. at 229, 93 S.Ct. at 2049. There is a critical fact established in the instant case that sets it apart from other Union Station cases: Oliver's recent encounter with the same group of detectives and his belief, which the trial court credited as reasonable, that the same detective had questioned and searched him on both occasions. The previous encounter began as a series of substantially similar questions culminating in a search of both Oliver's bag and of his person. On that occasion, Oliver initially refused to consent to the search of his bag. The detective made it clear that although Oliver was free to leave, his bag must remain with the detectives. After having searched Oliver's bag, which contained only articles of clothing, the detective demanded either a pat-

down or a dog sniff of Oliver's person. The trial court specifically found that Oliver's consent to these prior searches was involuntary, and thus that the searches were unconstitutional.

■ In these unique circumstances, we cannot accept the trial court's finding that Oliver consented voluntarily to the present search. It is true, as the judge stated, that the fact that Oliver "objected at one time to having a search of his person and his luggage doesn't *necessarily* mean that he has to act consistently with that if he's approached under the same conditions" (emphasis added). But of necessity the message conveyed to him on the previous occasion would bear importantly on "the nature of [his] subjective understanding" of his rights. *Schneckloth, supra,* 412 U.S. at 230, 93 S.Ct. at 2049. On this record, we can find nothing to offset the effect of the experience Oliver claimed (and was found by the court) to have had of encountering the same detectives earlier in circumstances where they essentially disregarded his refusal to consent to a search. The interval between the searches was relatively brief, and the trial judge did not dispute appellant's contention that the prior coercive search had remained vivid in his memory. Thus, applying the standard of review appropriate to factual findings, we are "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

Because the pat-down of appellant was neither consented to nor (as the government concedes) supported by articulable suspicion, the discovery of the hard lumpy substance in his crotch area was the product of an illegal search. We therefore need not consider the government's argument that the discovery of that evidence provided reason for the police to conduct the more intrusive search of Oliver's body in the men's room.

*Reversed.*

WAGNER, Associate Judge, concurring in part and dissenting in part:

I concur with the majority's disposition of the seizure question; however, I respectfully dissent from its determination that the trial court erred in concluding that the search involved here was consensual. In my view, the trial court's findings are supported by the record and, therefore, should not be disturbed. *See Kelly v. United States,* 580 A.2d 1282, 1285 (D.C.1990). Whether a consent which would justify a search is voluntary is a question of fact which must be determined from the totality of circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973); *Kelly,* 580 A.2d at 1285. Since the determination of the question is essentially fact-based, we must " 'uphold the trial court's finding that a search was consensual unless such a finding is clearly erroneous.' " *Id.* at 1285 (quoting *Childress v. United States,* 381 A.2d 614, 618 (D.C.1977)); D.C.Code § 17–305(a) (1989). Consonant with that proposition, in my opinion, there is no basis to overturn the trial court's ruling.

The trial court found that appellant consented to the search, basing its finding on the circumstances surrounding appellant's encounter with the police and appellant's "subjective state" as a result of his prior experience with the drug interdiction team. *See Schneckloth, supra,* 412 U.S. at 229, 93 S.Ct. at 2049 (in determining if consent was coerced, "account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents"). Specifically, the trial court credited Detective Zattau's testimony that he asked appellant if he could speak with him, that they conversed thereafter about the drug problem in the District, and that appellant consented to a patdown. The trial court found further that during the patdown, the detective discovered a bulge in appellant's crotch which appellant explained was a colostomy bag, and that appellant "kind of picked up his shirt to show what it was...." Although appellant indicated that he did not want to

be searched in public, he assented to accompanying the officers to the bathroom to continue the search, according to the court's findings. While there is conflicting evidence on some of these issues, having determined credibility and resolved the conflict, the trial court made the foregoing findings which are supported by evidence in the record. I do not understand the majority to disagree up to this point.

The critical facts which account for the majority's rejection of the trial court's finding of consent pertain to the circumstances surrounding appellant's prior encounter with a drug interdiction team and its effect upon appellant's "subjective understanding" of his rights. What appears to divide us is a difference in our perceptions of the trial court's findings on the issue and the evidence upon which the court relied in making them. The trial court found that on the earlier occasion, appellant allowed the search of his luggage because of "an implied threat that a dog could always sniff the luggage" and that the police searched appellant's bag against his will. The court did not find that the police searched appellant's person against his will on that earlier occasion. Rather, the court's ruling conveys that appellant allowed the police to search his person at the suggestion of his companion, in order to avoid further delay.[1] The record supports these findings. During the redirect examination, responding to questions of defense counsel, appellant testified as follows:

Question: All right. When did he threaten to call the dogs on you? When it was your bags or when it was you.

Answer: When it was my bag.[2]

Apparently, the trial court accepted this particular version of the events and rejected appellant's explanation that he thought he would not be permitted to leave. In fact, appellant testified that he informed the officer that he had no right to search him during the earlier encounter,[3] and the court so found.

The court weighed against appellant his inability to explain why he did not walk away from the police while in the train station, since he knew that he did not have to consent to the search. The trial court was not obliged to infer from the evidence or conclude on the record before it, as the majority apparently does, that appellant's earlier encounter left him with the subjective understanding that he either had no right to object or that the police would disregard his refusal to consent. The contrary inferences made by the trial court from the evidence are reasonable, and it is within the trial court's province to make that determination. *See Nche, supra* note 2, 526 A.2d at 24 (credibility of witnesses and inferences to be drawn from their testimony are for trier of fact whose determination cannot be disturbed unless plainly wrong or unsupported by evidence). The trial court's findings are supported by the record and are not clearly erroneous. Accordingly, we should uphold them. *See*

---

1. The pertinent parts of the trial court's findings were as follows:

   I will credit [appellant's] testimony that he was with a friend and that Detective Hanson who testified here, approached and asked him the same types of questions that had been asked by Zattau, that at that particular time, I think it's consistent from both their testimonies that [appellant] was not interested in having his luggage—his bag that he was carrying at the time searched and he was not interested in having his person searched and made that known and that I think it's probably correct, although it's not critical to find this that upon an implied threat that a dog could always sniff the luggage, [appellant] was probably willing to go along with that, but nevertheless his friend said let's not waste time. The search was done of his person.

The search was done of his *bag* against his will and he left, there having been nothing discovered. (Emphasis added).

2. In earlier testimony, appellant had stated that the officers threatened to have the dog sniff him. His defense counsel cleared up the matter during redirect examination, and the trial court credited the later version, which is within its province. *See Nche v. United States*, 526 A.2d 23, 24 (D.C.1987).

3. The court questioned appellant as follows:

   THE COURT: And you told this same officer, this detective at that time, he couldn't search your bag and, he had no right to do that; and he couldn't search you, he had no right to do that; right?
   APPELLANT: Yes.

*Kelly, supra,* 580 A.2d at 1288.[4]

---

**4.** The foregoing analysis necessitates consideration of another issue raised by appellant. Appellant also argues that the trial court erred in concluding that he could not revoke his consent after the police discovered that the bulge was not the colostomy bag and that appellant's jockstrap, which contained the bulge, was worn over his boxer shorts. Although the court expressed the view that appellant could not limit the scope of the search, an issue we need not decide, the court did not find that appellant expressly refused a further search. The record supports that appellant did not refuse the search which occurred.