*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 23-CF-0389

DAIQUON D. GREER, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2022-CF2-003690)

(Heidi M. Pasichow, *Judge*)

(Argued May 8, 2024                                    Decided May 14, 2026)

*Sweta Patel* for appellant.

*Michael C. Lee*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb*, *Nicholas P. Coleman*, *Callie Hyde*, and *Erica Rudolf*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH and MCLEESE, *Associate Judges*, and RUIZ, *Senior Judge*.

BECKWITH, *Associate Judge*: Daiquon Greer was convicted of multiple firearm offenses at a stipulated trial after the trial judge denied his motion to suppress. Because the officers found Mr. Greer's unregistered weapon after they

seized him in violation of the Fourth Amendment, we conclude that the trial court erred in denying his motion to suppress and we reverse his convictions.

**I.**

According to Officer Donald Green's testimony at the suppression hearing, he and several other Metropolitan Police Department officers responded to an afternoon shooting on Georgia Avenue NW. While the officers were investigating the earlier crime, one of Officer Green's colleagues (Afam Ishakwue) signaled to Officer Green that he thought that Mr. Greer, who was walking by the scene, had a gun hidden in his waistband. Based on this signal, Officer Green followed Mr. Greer and tried to engage him. Body-worn camera (BWC) footage introduced at the hearing shows Officer Green and Officer Ishakwue converge on Mr. Greer as Officer Green asks him, "[H]ow you doing man?" Although Mr. Greer responds "alright" and slows his pace, he continues walking away from the officers. At this point, Officer Green circles around Mr. Greer and stops in front of him while Officer Ishawkue can be seen standing to Mr. Greer's right. Officer Green asks Mr. Greer if he "has anything on" him, and when Mr. Greer says "no, I'm good," Officer Green asks if Mr. Greer "mind[s] lifting up [his] shirt." Mr. Greer declines, Officer Green asks if he's sure, and Mr. Greer responds "I'm positive," while shifting his weight to his left foot. At this point, the officers tackle Mr. Greer to the ground, handcuff

him, and threaten to shoot him. By the time the officers find a gun in Mr. Greer's waistband, there are at least four officers surrounding him.

The trial court orally denied Mr. Greer's motion to suppress. The court concluded that the seizure began at the point when the officers grabbed Mr. Greer and tackled him to the ground. The officers had reasonable articulable suspicion to justify the seizure at this point because Officer Green testified (credibly, in the trial court's view) that "he saw clearly an outline of a firearm" at Mr. Greer's waist, BWC footage showed Mr. Greer covering that area of his waistband while he faced the officers, and photographs introduced at the hearing showed a bulge where the officers ultimately found the gun.

After the trial court denied Mr. Greer's motion to suppress, Mr. Greer agreed to a stipulated trial and the court found him guilty of carrying a pistol without a license, possession of a large capacity ammunition feeding device,[1] possession of an

---

[1] In several recent cases, the government has sought vacatur of convictions under Section 7-2506.01(b) for possession of large capacity ammunition feeding devices because it views that Section as a violation of the Second Amendment. *See e.g.*, *Williams v. United States*, No. 24-CF-386, 2026 WL 958973, at *8 (April 9, 2026). This court recently agreed with the United States that the District's ban on high-capacity magazines is unconstitutional, but that decision was subsequently vacated and en banc review granted. *See Benson v. United States*, 352 A.3d 719 (D.C. 2026), *rehearing en banc granted, vacated by* No. 23-CF-514, 2026 WL 1098104 (April 22, 2026). Here, neither the government nor Mr. Greer raised a Second Amendment challenge to the conviction, either in their briefs or in any

unregistered firearm, and unlawful possession of ammunition. He appeals his convictions.

## II.

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. "The crucial test in deciding whether a person has been seized is whether, 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *T.W. v. United States*, 292 A.3d 790, 795 (D.C. 2023) (quoting *Immigr. & Naturalization Serv. v. Delgado*, 466 U.S. 210, 215 (1984)). "Whether a seizure has occurred for Fourth Amendment purposes is a question of law which this court reviews de novo, deferring to the trial court's factual findings, unless clearly erroneous." *Dozier v. United States*, 220 A.3d 933, 940 (D.C. 2019) (quoting *Jackson v. United States*, 805 A.2d 979, 985 (D.C. 2002)).

Mr. Greer argues that he was seized at the moment Officer Green stepped in front of him, effectively blocking his exit path. The government asserts that Mr. Greer was not seized until the officers tackled him to the ground because before this moment, they were not blocking his exit. The record belies the government's

subsequent filings to this court. Because we reverse Mr. Greer's convictions on Fourth Amendment grounds, we do not address the issue.

account. Officer Green acknowledged at the suppression hearing that when he stepped in front of Mr. Greer he was "standing in front of" him and "[b]locking . . . the path that he was walking." The BWC footage supports this testimony—although Mr. Greer continued walking away from the officers while they followed behind him and asked him questions, he came to a stop when Officer Green circled in front of him. At that point, Mr. Greer was effectively blocked in on three sides with Officer Green standing in front of him, Officer Ishakwue standing to Mr. Greer's right, and a store front to Mr. Greer's left. Although Mr. Greer could conceivably have turned around or attempted to circle back around the officers to leave the encounter, our focus for the seizure question is on whether the defendant "would have reasonably understood the officers to be blocking his exits, not whether they were perfectly effective in doing so." *T.W.*, 292 A.3d at 799.

Here, a reasonable person would have felt blocked in, not only because of the officers' positions relative to Mr. Greer, but also because the officers (1) approached him from behind, *see Carter v. United States*, 341 A.3d 1067, 1073 (D.C. 2025) (noting that being approached from behind "would make any objective and reasonable person feel uneasy and intimidated, especially when faced with an openly visible firearm within close proximity"), (2) approached him while dressed in police uniforms and carrying visible weapons, *see Dozier*, 220 A.3d at 941 (When "a 'visibly armed police officer in full uniform and tactical vest emerges without

warning . . . to interrupt a person going about his personal business,' the encounter is not 'between equals.'" (quoting *Jones v. United States*, 154 A.3d 591, 595 (D.C. 2017))), (3) persisted in following Mr. Greer even as he demonstrated that he did not wish to engage with them, *see Carter*, 341 A.3d at 1073 (officers' questioning "implied to the defendants that they would continue to be suspected of criminal activity until the officers stopped asking questions, thereby leaving them with little choice but to respond"), (4) asked him to raise his shirt (which he declined to do) even after he had already deflected the officer's initial questions, *see id.*, and (5) had the support of several other officers just steps away, *see T.W.*, 292 A.3d at 795 (identifying the "presence of several officers" as a relevant circumstance that might signify that a seizure occurred (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980))).

The government cites to *Kelly v. United States*, where we held that two officers did not seize a suspect when they followed behind him, began asking him questions, and circled around in a formation similar to the one that the officers adopted here, with one officer speaking to Mr. Kelly while the other officer stood about four feet away. 580 A.2d 1282, 1284-85 (D.C. 1990). *Kelly* is distinguishable from the case before us in two important respects: First, "the questioning officer asked Mr. Kelly if he could speak with him, thereby implying to Mr. Kelly that he did not have to comply." *Carter*, 341 A.3d at 1075 (citing *Kelly*, 580 A.2d at 1286).

Indeed, Mr. Kelly "readily provided answers to the detective's questions" and granted the detective's request to search his possession. *Kelly*, 580 A.2d at 1286. Second, the two officers who approached Mr. Kelly "were in plain clothes and neither was visibly carrying a firearm or displaying their badges." *Carter*, 341 A.3d at 1075 (citing *Kelly*, 580 A.2d at 1284). Here, the officers did not give Mr. Greer the opportunity to refuse to speak with them and they approached him visibly armed and wearing their police uniforms.

The government also argues that other factors, such as the officers' casual demeanor, the presence of pedestrians, and the fact that the encounter took place during the day meant that "the circumstances were not sufficiently intimidating or coercive to indicate to Greer that he was not free to leave." But these facts were also present in *Carter v. United States*, where four officers dressed in tactical vests approached a group of ten men. 341 A.3d at 1069. We held there that a seizure occurred at the point that two of the officers approached the subset of the group where Mr. Carter was hanging out and asked Mr. Carter how he was doing, whether he had anything on him, and if he would mind hiking up his pants. *Id.* at 1069, 1080. Even more intimidating than in *Carter*, here, Mr. Greer was effectively alone. Although there were pedestrians walking by, unlike in *Carter*, he was not surrounded by a group of presumed friends. And compared to the two—or perhaps four, depending on how you count—officers approaching the group in *Carter*, here, there

were more officers close at hand. Officer Ishakwue's BWC footage shows eight other officers on the scene and Officer Green's footage indicates that at least three additional officers showed up to assist as soon as Mr. Greer was tackled to the ground—indicating that they were just steps away from Mr. Greer at the moment Officer Green circled him. Like in *Carter*, no reasonable person would have felt that they were free to continue ignoring Officer Green's questions at the moment he circled in front of Mr. Greer.

Because the trial court reached a different conclusion on this initial question of when the seizure began, we would normally remand for the trial court to consider whether the officers had the required reasonable articulable suspicion at this earlier moment of seizure. *See Maye v. United States*, 260 A.3d 638, 644 (D.C. 2021) ("[A] police officer 'may conduct a brief stop (a seizure) for investigatory purposes when he has reasonable suspicion supported by specific and articulable facts that the individual is involved in criminal activity.'" (quoting *Pridgen v. United States*, 134 A.3d 297, 301 (D.C. 2016))). Yet we need not do so here because it would be clear error to find that Officer Green saw the bulge in Mr. Greer's pants that provided the requisite suspicion before the seizure began. *See Kinney v. United States*, 286 A.3d 1027, 1038-39 (D.C. 2022) (concluding that "no remand is necessary" where "the government has not produced evidence sufficient to" support a ruling in its favor). At the suppression hearing, Officer Green testified that the first time he observed

what he believed to be a firearm in Mr. Greer's pants was when he "walked around to the front of him." Given this testimony, the government conceded at oral argument that "the record is clear that the gun wouldn't have been seen before" the moment that Officer Green turned and stood in front of Mr. Greer and that until that moment there was not reasonable articulable suspicion.

\* \* \*

We reverse the judgment of the Superior Court and remand for further proceedings consistent with this opinion.

*So ordered.*