# District of Columbia
# Court of Appeals

**No. 15-CM-129**

ALBERT JONES,

Appellant,

FILED
FEB **23** 2017
DISTRICT OF COLUMBIA
COURT OF APPEALS

v.

**CMD-17569-14**

UNITED STATES,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: GLICKMAN and FISHER, *Associate Judges*; and RUIZ, *Senior Judge.*

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the appellant's conviction is reversed.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: February 23, 2017.

Opinion by Associate Judge Stephen Glickman.

Dissenting opinion by Associate Judge John Fisher.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 15-CM-129

ALBERT JONES, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED 2/23/17
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CMD-17569-14)

(Hon. Harold L. Cushenberry, Jr., Trial Judge)

(Argued June 7, 2016                    Decided February 23, 2017)

*Joseph A. Mokodean* for appellant.[*]

*Vivian Kim*, Assistant United States Attorney, for appellee. *Vincent H. Cohen, Jr.*, Acting United States Attorney at the time the brief was filed, and *Elizabeth Trosman, Elizabeth H. Danello*, and *Jay Apperson*, Assistant United States Attorneys, were on the brief for appellee.

Before GLICKMAN and FISHER, *Associate Judges*, and RUIZ, *Senior Judge*.

Opinion for the court by *Associate Judge* GLICKMAN.

Dissenting opinion by *Associate Judge* FISHER at page 16.

---

[*] On November 18, 2016, this court granted Mr. Mokodean's motion to withdraw and appointed McGennis Williams as counsel for appellant.

GLICKMAN, *Associate Judge*: Albert Jones appeals his conviction for unlawful possession of cocaine. He claims the trial judge erred in denying his motion to suppress the cocaine as the fruit of an unconstitutional seizure when a police officer detained him, without reasonable articulable suspicion, for questioning and a warrant check. The government argues that appellant was not seized within the meaning of the Fourth Amendment's prohibition on unreasonable searches and seizures. Whether appellant was seized is the sole disputed issue before us; if he was, the government does not deny that the seizure was unlawful for lack of reasonable articulable suspicion or that the cocaine was the excludable fruit of the constitutional violation.

We conclude that a reasonable person in appellant's position would not have felt free to terminate the encounter of his own accord and go about his business by the time the police officer asked to inspect the contents of a cigarette box in his possession. We therefore agree with appellant that he was seized in violation of his Fourth Amendment rights and that the cocaine found in the cigarette box should have been suppressed. Accordingly, we reverse appellant's conviction.

**I.**

At the hearing on appellant's suppression motion, the government relied on one witness, Metropolitan Police Officer Zachary Blier. Officer Blier testified that he was on patrol, driving a marked police cruiser, when he came upon appellant on the evening of October 3, 2014. Sitting in the front passenger seat of the cruiser with Blier was his partner, Metropolitan Police Officer Gregory Collins. Blier was in uniform and wearing an outer tactical vest that said "Police" on the front and back. He also was wearing a gun.

The encounter occurred at around 6:00 p.m. when the officers drove into an alley in the 2500 block of North Capitol Street, Northeast. It was still daylight. The alley was narrow, only about fifteen to twenty feet wide, with a row of houses on one side and a graveyard on the other. Blier testified that he knew the area to be one "that's historically had a high volume of drug sales." Upon entering the alley, Blier saw appellant walking toward him. Appellant was alone. Blier noticed that appellant was "fiddling with a Newport cigarette box," and that when appellant looked up and saw the police car, he "immediately" lowered the hand holding the cigarette box to his side. This captured Blier's attention because he "kn[e]w individuals commonly hide drugs and drug paraphernalia in Newport boxes."

Appellant continued on his way. As he proceeded alongside the police car on the driver's side, Blier rolled down the window and said, "hey, man, how you doing?" In response, appellant stopped and turned to face Blier. Blier asked appellant where he was coming from and stepped out of the car to "engage" appellant in "conversation." When he exited the car, Blier saw appellant put the cigarette box behind his back as if to hide it from view. This increased Blier's suspicions. He asked appellant for his name, date of birth, and "probably" his address, all of which appellant provided. Blier wrote down the information and gave it to Officer Collins to "run in the system." He then asked appellant, "hey, can I see that cigarette box?" Appellant handed it to him. Blier opened the box, looked inside, and saw what he recognized to be crack cocaine. Appellant then was searched and placed under formal arrest.

Blier testified that his questioning of appellant prior to discovering the cocaine was "cordial" and lasted only a minute or two. During that time, Blier said, he gave no orders to appellant, made no threats, and did not have physical contact with appellant. He did not display or reach for his weapon. When asked how close he stood to appellant while questioning him, Blier stated that "as I opened my door . . . he was in front of my door so he was, kind of stepped back a little bit and I closed my door. I mean, we were just face to face, maybe separated by three or four feet."

Appellant was the only other witness at the hearing on his motion. His description of the encounter matched Blier's in most respects. Appellant testified that Blier asked him about half a dozen questions in all, including where appellant was coming from, why he had no shopping bags (since appellant told Blier he had been shopping), his name and date of birth, whether he had personal identification on him (he did not), and where he lived. Appellant answered Blier's questions while standing in the space between the door of the cruiser and the wall of the graveyard. According to appellant, Blier remained seated inside the car during this questioning because the officer could not open the car door completely while appellant was standing only "a few inches" away from it in the "too narrow" space beside the vehicle. While appellant "could have continued walking through if [Officer Blier] wouldn't have stopped," he did not feel he could walk away "[b]ecause [Officer Blier] didn't give me an indication that I could leave" ("[i]t was more of an authority indication that I was being detained"), and "the questioning was like I was being detained." Blier then asked appellant what was in the cigarette box he was holding, and appellant said it contained cigarettes. At that point, appellant testified, Blier "command[ed]" him to place the cigarette box on the roof of the police car and move to the rear of the car. Only then, according to appellant, did Blier get out of the police cruiser.

The trial judge credited Blier's testimony. He found that Blier "drove up alongside" appellant in a "very narrow" alley after seeing him "fidgeting with a Newport cigarette box," and that Blier was "suspicious" of the cigarette box and proceeded to question appellant. In response to the officer's inquiries, appellant "provided information about his date of birth and his name such that [Blier's] partner could run perhaps a WALES check to see if there's any outstanding warrants."[1] Blier then asked appellant if he could see the cigarette box, and appellant handed it to him; the judge found implausible and did not believe appellant's testimony that Blier ordered him to place the cigarette box on the roof of the police car. We infer that the judge also accepted Blier's testimony that he exited the car at the outset of the confrontation to question appellant face to face, and disbelieved appellant's conflicting testimony that Blier remained inside the cruiser until appellant obeyed his command to put the box on the roof.

The judge considered it "a very close question" under these circumstances whether appellant had been seized unlawfully within the meaning of the Fourth Amendment by the time he gave the cigarette box to Blier. Ultimately, however,

---

[1] "WALES" is the computerized Washington Area Law Enforcement System. As the judge said, it enables police officers to call in and check for the existence of outstanding warrants to arrest persons with whom they come into contact. *See Carter v. United States*, 614 A.2d 542, 543 n.2 (D.C. 1992).

the judge ruled that appellant had not been seized at that point, and that he consented to a search of the cigarette box by voluntarily turning it over at Blier's request. The judge concluded that the encounter was not "so coercive" prior to the search as to amount to a seizure because it lasted only a minute or two, Blier spoke to appellant in a "cordial" tone of voice without demanding he do anything, and the officer did not touch appellant or draw his weapon at any time. The judge thought the encounter would have been "more coercive" if it had been longer and appellant had had "to wait on the scene while [the officers] ran information or came back and checked on him to get more information."

## II.

When we review a ruling on a motion to suppress, we defer to the trial judge's factual findings unless they are clearly erroneous, but whether there was a seizure for Fourth Amendment purposes is a question of law that we review *de novo*.[2] "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions."[3] Rather, "a seizure will have occurred only

---

[2] *Jackson v. United States*, 805 A.2d 979, 985 (D.C. 2002).

[3] *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *see also id.* at 437 ("[N]o seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage.").

when the officer, by means of physical force or show of authority, has in some way restrained someone's liberty."[4]  Accordingly, in a street encounter such as this one, "the test for determining whether a person has been seized 'is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business' – in other words, that he was 'not free to leave.'"[5]  The hypothesized "reasonable person" in this test is an *innocent* person.[6]

The message that a suspect is not free to leave or terminate the inquiry can be conveyed, not necessarily intentionally, in ways less obvious than actual physical force or explicit command.  In *United States v. Mendenhall*,[7] Justice Stewart wrote that "[e]xamples of circumstances that might indicate a seizure, even

---

[4]  *Gordon v. United States*, 120 A.3d 73, 78-79 (D.C. 2015) (internal citations omitted) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).

[5]  *Id.* at 79 (quoting *Bostick*, 501 U.S. at 436-37); *see also Bostick*, 501 U.S. at 439 ("[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.").

[6]  *Id.* at 438.

[7]  446 U.S. 544 (1980).

where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."[8]  These particular circumstances were largely absent or of lesser import in this case.  There were not "several" officers on the scene, but just two, and while this still meant that appellant was outnumbered by the police, Officer Collins remained seated in the police car and said nothing to appellant while he was being confronted by Officer Blier.  Although appellant could see that his interlocutor was armed with a gun, and that was not a negligible factor bearing on whether a reasonable person in his position would feel free to leave,[9] Officer Blier never withdrew or reached toward the weapon.  Nor did Blier make physical contact with appellant's person.  The officer's tone was cordial throughout the encounter and he never threatened appellant or ordered him around.  The judge specifically found that Blier did not command appellant to relinquish the cigarette box.  Furthermore, while Blier's questioning and request for the cigarette box conveyed the officer's suspicion of appellant, Blier did not subject appellant to the kind of repeated, explicitly

---

[8] *Id.* at 554 (opinion of Stewart, J.).

[9] *See In re J.F.*, 19 A.3d 304, 309 (D.C. 2011) (identifying "the visibility of the officers' guns in their waistbands" as a circumstance demonstrating that J.F. was seized).

accusatory questioning that we have said may "make reasonable persons believe they [are] not free to leave until the officers were satisfied."[10]

Even so, an encounter in which a visibly armed police officer in full uniform and tactical vest emerges without warning from a police cruiser to interrupt a person going about his private business is not an encounter between equals. "[O]ur precedents direct [us to] take an 'earthy' and realistic approach to such street encounters."[11] The officer, however well-intentioned and polite, initiates the meeting with an undeniable air of authority that ordinary persons do not presume to possess when interrupting strangers on the street. Where, as here, the questioning is at least implicitly accusatory (if not explicitly so), a reasonable person's natural reaction is not only to show respect for the officer's authority, but also to feel vulnerable and apprehensive. The circumstances are more intimidating if the person is by himself, if more than one officer is present, or if the encounter

---

[10] *Gordon*, 120 A.3d at 82 (holding that suspect was unlawfully "seized" when police officers, without reasonable articulable suspicion, repeatedly questioned him about his identity for about ten minutes); *see also Jackson*, 805 A.2d at 988; *Hawkins v. United States*, 663 A.2d 1221, 1228 (D.C. 1995); *Guadalupe v. United States*, 585 A.2d 1348, 1360-61 (D.C. 1991).

[11] *Jackson*, 805 A.2d at 988.

occurs in a location that is secluded or out of public sight.[12]  This court accordingly has recognized that a police officer's "questioning d[oes] not have to assume an intensity marking a shift from polite conversation to harsh words to create an intimidating atmosphere."[13]  In such an atmosphere, a reasonable person who can tell from the inquiries that the officer suspects him of something, and who cannot know whether the officer thinks there is sufficient reason to detain him, may well doubt that the officer would allow him to avoid or terminate the encounter and just walk away.[14]

---

[12]  *See, e.g.*, *In re J.F.*, 19 A.3d at 309-10 (holding that J.F. was seized when, *inter alia*, two police officers, visibly armed and wearing "police vests and police badges," drove up to him and his companion on a "deserted" street to question them).  In this case, although the witnesses did not testify explicitly that no one else was present in the alley, there is no suggestion in the record that anyone was there other than appellant and the police.

[13]  *Guadalupe*, 585 A.2d at 1361; *see also, e.g.*, *Brown v. United States*, 983 A.2d 1023, 1027-28 (D.C. 2009) (Schwelb, J., concurring in the judgment and dissenting in part).

[14]  On that score, this court has seen many cases in which individuals who attempted to walk away from a police officer were prevented from doing so despite the absence of reasonable articulable suspicion to justify a stop.  *See, e.g.*, *Green v. United States*, 662 A.2d 1388, 1391 (D.C. 1995) (police frisked appellant unlawfully, after he pocketed a small, dark object and walked away from officer, despite lack of reasonable suspicion); *Duhart v. United States*, 589 A.2d 895, 900-01 (D.C. 1991) (illegal seizure and search where appellant's "mere[] attempt[] to walk away" did not support reasonable suspicion but officer proceeded to grab appellant's wrist and search him); *Smith v. United States*, 558 A.2d 312, 317 (D.C. 1989) (en banc) ("walk[ing away] at a fast pace" when police arrived did not suffice for reasonable suspicion, but police officer stopped appellant anyway by placing a hand on his shoulder); *In re D.J.*, 532 A.2d 138, 141 (D.C. 1987) (same

(footnote continued …..)

We do not say that these considerations, without more, rendered the encounter in this case a Fourth Amendment seizure of appellant's person.[15] But they provide important context for two additional circumstances present in appellant's interaction with Officer Blier that we think materially increased its coerciveness.

First, appellant argues that Officer Blier impeded him from continuing on his way and effectively hemmed him in when, after stopping the cruiser in the middle of a "very narrow" alley (per the judge's findings), the officer got out and planted himself in appellant's path in the straitened space (clearly but a few feet wide) between the vehicle and the alley wall. We suppose it still would have been possible for appellant to ignore Blier and squeeze on past him or turn his back on the officer and retrace his steps so as to leave the alley by the way he entered it.

---

(…..footnote continued)
"mere[] attempt[] to walk away," from which "[n]o adverse inference may be drawn," led to police pursuit by car and on foot).

[15] *See Mendenhall*, 446 U.S. at 553-54 ("The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.") (internal quotation marks omitted) (opinion of Stewart, J.); *cf. Lawrence v. United States*, 566 A.2d 57, 60 (D.C. 1989) ("[T]he [Supreme] Court has concluded that reasonable persons would feel free to leave under circumstances in which many of us would discern the existence of considerable pressure not to do so.").

Nonetheless, we agree that the officer's face-to-face confrontation of appellant in such a confining area substantially reduced the ease with which appellant could have walked on or otherwise avoided the encounter.[16] This did help to convey the message to a reasonable person in appellant's position that he was not free to disregard the police and go about his business.

Second, appellant points to the fact that Officer Blier asked his partner to "run" appellant's name through "the system" to check whether there was an outstanding warrant for appellant's arrest.[17] Immediately after making this request,

---

[16] *Cf. In re D.T.B.*, 726 A.2d 1233, 1234-35 (D.C. 1999) (appellant held to have been seized inside laundromat where officer stood beside laundromat's only door "in full uniform" and, in a "stern and commanding tone," ordered appellant twice to "come here"); *Kelly v. United States*, 580 A.2d 1282, 1287 (D.C. 1990) (no seizure when plainclothes officers, wearing neither visible guns nor badges, stopped suspect in a crowded, public train station with multiple exits, since "the location of the encounter – the public area of Union Station – was unintimidating").

[17] Appellant failed to cite this fact in his briefs on appeal. However, his trial counsel did rely on it during the argument on appellant's suppression motion and, as noted above, the trial judge explicitly considered the warrant check in his totality-of-the-circumstances ruling. On appeal, post-briefing but in advance of oral argument, appellant submitted a letter pursuant to D.C. App. R. 28 (k) calling attention to the holding in *Ramsey v. United States*, 73 A.3d 138, 148 (D.C. 2013), that a police officer's otherwise consensual encounter with the appellant turned into a seizure when the officer performed a warrant check. Oral argument in this court focused on the potential import of *Ramsey*. For these reasons, we are persuaded that appellant has not abandoned or forfeited reliance on the warrant check to support his claim that he was seized, and that the government has had a

(footnote continued …..)

and evidently before its results were received, Blier asked to see appellant's cigarette box. In both *Ramsey v. United States* and our later decision in *Gordon v. United States*, this court concluded that a warrant check converted an otherwise consensual street encounter with police into a seizure.[18] As those cases appreciated, an officer's decision to run a check for outstanding arrest warrants can be a pivotal event in such an encounter; it sends a strong signal to a reasonable person that the officer will not allow him to leave while the inquiry is in progress precisely because the outcome of the inquiry may necessitate the person's detention. The trial judge discounted the importance of the warrant check in this case because it did not prolong appellant's encounter with the police, but that

_____

(…..footnote continued)
fair opportunity to meet the argument and is not unfairly prejudiced by our consideration of it.

[18] *See Gordon*, 120 A.3d at 81-82 ("[W]e see the computer check as a factor that caused a material acceleration of a conversation initially deemed consensual at law to a conversation that reflected a seizure."); *id.* at 81 n.40 ("'[W]e find it difficult to posit that a reasonable person would think that he or she was free to leave at a time when that person is the investigatory subject of a pending warrant check.'") (quoting *State v. Hall*, 115 P.3d 908, 917 (Or. 2005), *overruled on other grounds by State v. Unger*, 333 P.3d 1009 (Or. 2014)); *Ramsey*, 73 A.3d at 149 ("The fact that the WALES check extended what had been Officer Lally's consensual encounter with appellant by only a brief time (perhaps less than a minute or two) did nothing to negate the fact that the warrant check turned the encounter into a seizure."); *id.* at 148 nn.19, 21 (citing cases from other jurisdictions). The officer in *Ramsey* may have held on to the suspect's physical ID while performing the warrant check (which would have made it even more difficult for the suspect to leave), but that was not so in *Gordon*, where the suspect, as in the present case, did not have an ID.

misses its true significance. However long the warrant check took, while it was under way it conveyed a message that appellant's liberty was being restrained. The critical point here is that the warrant check was still under way, its results not yet known, when Officer Blier asked for appellant's cigarette box.

Like the trial judge, we view it as a close legal question whether appellant was seized within the meaning of the Fourth Amendment. Nevertheless, despite the brevity, cordiality, and absence of physical restraint in appellant's encounter with Officer Blier, the other circumstances we have discussed persuade us that a reasonable person in appellant's shoes would not have felt at liberty to terminate the encounter unilaterally by the time the officer asked for the cigarette box. We hold that appellant was seized within the meaning of the Fourth Amendment.

The government concedes that the police lacked the reasonable articulable suspicion of criminal activity on appellant's part necessary to make his seizure lawful.[19] Under the exclusionary rule, the cocaine recovered from appellant during the seizure therefore should have been suppressed as the fruit of the Fourth Amendment violation; appellant's purported voluntary consent to Officer Blier's

---

[19] *See Terry v. Ohio*, 392 U.S. 1, 21 (1968); *see also, e.g.*, *Green*, 662 A.2d at 1391 ("Green's pocketing of a 'small, dark object'" and walking away from police "insufficient to establish grounds for a *Terry* stop").

search of the cigarette box, given while appellant was being detained, was not shown to be "sufficiently an act of free will to purge the primary taint of the unlawful seizure."[20]

\* \* \* \*

For the foregoing reasons, appellant's conviction is hereby reversed.

*So ordered.*

FISHER, *Associate Judge*, dissenting: Holding that an unlawful seizure occurred, the majority focuses on the impact of the warrant check, an issue that was not properly raised in either the trial court or this court. We should treat this argument as forfeited. *See Lowery v. United States*, 3 A.3d 1169, 1177 (D.C. 2010); *Artis v. United States*, 802 A.2d 959, 965 (D.C. 2002).

---

[20] *Hicks v. United States*, 705 A.2d 636, 641 (D.C. 1997) (internal quotation marks omitted). In cases involving an unlawful seizure, "[t]he government bears the burden of proving 'that the causal chain was sufficiently attenuated by an independent act to dissipate the taint of the illegality.'" *Oliver v. United States*, 656 A.2d 1159, 1172 (D.C. 1995) (quoting *United States v. Wood*, 981 F.2d 536, 541 (D.C. Cir. 1992)). "When statements and conduct evidencing consent to a search are given contemporaneously with the illegal seizure, with no break in the causal chain, the actions of the person seized are not free from the taint of unlawful detention and are thus insufficient to show consent." *McGann v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 8 F.3d 1174, 1184 (7th Cir. 1993).

Two days before trial, defense counsel filed an untimely and perfunctory motion to suppress which claimed that the police had unlawfully searched the cigarette box without consent after ordering appellant to place it on the police car. The motion did not mention a warrant check, much less assert that it had turned a consensual encounter into a seizure. This is important because neither the trial court nor the prosecutor was put on notice of the need to create a factual record illuminating that issue. The warrant check was mentioned in the testimony, but defense counsel did not argue that it was a factor which turned the encounter into a seizure. I see nothing to indicate that appellant was "detained" while the warrant check was completed.

Appellant certainly did not pursue that issue on appeal. Instead he asserted that he was "illegally seized . . . when [Officer Blier] blocked [his] path in a narrow alley and asked him a series of accusatory questions." Neither appellant's opening brief nor his reply brief makes an issue of the warrant check, and neither cites *Ramsey* or *Gordon*, the cases on which the majority principally relies. The government understandably did not brief that issue.

The day before oral argument in this court, appellant filed a Rule 28 (k) letter citing *Ramsey*. That belated effort did not properly raise the issue for our consideration. It is well established that an appellant may not properly raise a new

issue in a reply brief, *see District of Columbia v. Patterson*, 667 A.2d 1338, 1346 n.18 (D.C. 1995), and we should not consider a new claim presented even later, in a letter filed the day before argument.

Putting basic fairness aside, *Ramsey* is factually distinguishable because the officer in that case apparently retained the defendant's identification while conducting the warrant check. A suspect naturally would be reluctant to walk away and leave his ID behind. Appellant was not carrying any identification, so that factor does not apply here. Moreover, *Gordon*'s holding was more modest than the majority describes. The police questioned Gordon for about ten minutes and repeatedly checked their computer databases. 120 A.3d at 76-77. We considered the computer checks to be a factor in the Fourth Amendment analysis, but concluded "[m]ore specifically, [that] the repeated questioning, especially when combined with the computer database searches, would convey to a reasonable person that the police were unsatisfied with his answers—to the point that he would not be free to leave until the computer database returned a positive result." *Id*. at 81. Nothing comparable happened here.

I dissent.