*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-CF-0388

DONTE J. CARTER, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2020-CF2-007280)

(Hon. Lynn Leibovitz, Trial Judge)

(Submitted April 18, 2024          Decided August 28, 2025)

*Brian D. Shefferman* was on the brief for appellant.

*Chrisellen R. Kolb*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time the brief was filed, and *John P. Mannarino*, *Benjamin Helfand*, *Jacqueline Yarbro*, and *Michael C. Lee*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH and MCLEESE, *Associate Judges*, and WASHINGTON,[*] *Senior Judge*.

Opinion for the court by *Senior Judge* WASHINGTON.

---

[*] Senior Judge Fisher was originally assigned to this case. Following his retirement on August 22, 2024, Judge Fisher was replaced by Senior Judge Washington.

Concurring opinion by *Associate Judge* MCLEESE at page 31.

WASHINGTON, *Senior Judge*: Appellant Donte Carter was conversing amongst a group of ten Black men on a sunlit sidewalk in Ward Four of the District. Despite not having raised any suspicion of engaging in criminal activity, the group was approached by four members of the Metropolitan Police Department's Gun Recovery Unit (GRU). One of the officers approached Mr. Carter from behind and asked whether he was carrying a firearm. Mr. Carter replied that he was not and twice lifted his shirt to demonstrate that nothing was hidden underneath. The officer then asked Mr. Carter to "hike" his pants up. In this appeal, we are asked to determine whether Mr. Carter was seized at this moment within the meaning of the Fourth Amendment. We hold that he was.

## I.    Background

Our articulation of the facts is based on both the trial court's extensive factual findings and footage from body-cameras worn by the officers. Neither party disputes these facts.

At some time between 3:00 and 4:00 pm on a sunny day in September 2020, five officers of the GRU[1] drove two unmarked vehicles into Ward Four of the

---

[1] The unit has since been renamed to the Violent Crime Impact Team (VCIT).

District, an area that consists predominantly of Black Americans,[2] to conduct a firearm interdiction.  They went there because of "an uptick in shootings and sounds of gunfire" in the area.  The officers observed ten Black men conversing on a sidewalk and parked along the road opposite them.  The group was split between three men "sitting and standing near some planters," and another seven men about fifteen feet away.  Among the group of seven men was appellant Mr. Carter, leaned up against a parked car and facing everyone else.

Four officers, Officers Sanders, Guzman, DelBorrell, and Keleman, emerged from the vehicles and approached the group.  They wore tactical vests with "police" written on the back as well as visible handcuffs, firearms, and other police equipment.  Officers Sanders and Guzman focused on the group of three and announced that they were "checking for firearms."  Almost immediately, and without being prompted to, one of the men lifted his shirt to reveal his waistband seemingly to demonstrate that nothing was hidden underneath.  Upon checking the

---

[2] Ward Four consists of approximately 44 percent Black Americans and 29 percent White Americans. *2020 Consensus Information & Data: Table 3*, D.C. Office of Plan., https://planning.dc.gov/publication/2020-census-information-and-data; https://perma.cc/B6QF-C8YQ.

man's waistband and a small bag he was carrying, Officers Sanders and Guzman continued toward the larger group.

Meanwhile, Officers DelBorrell and Keleman focused on Mr. Carter's group. Officer Keleman approached two individuals standing a few feet to Mr. Carter's left while Officer DelBorrell looped around the vehicle Mr. Carter was leaning on to approach him from behind. As Officer DelBorrell rounded the vehicle, another man approximately a foot ahead of Mr. Carter and several feet ahead of the officer also lifted his shirt to reveal his waistband. Within three to four feet of Mr. Carter, Officer DelBorrell asked how he was "doing," to which Mr. Carter briefly replied, "how are you doing" or "what's up" before turning away. Officer DelBorrell then moved closer to Mr. Carter but before he could say anything else, Mr. Carter also lifted his shirt to show his waistband and then lowered it. As Mr. Carter raised his shirt, DelBorrell asked, "[h]ey [c]hamp, you not got nothing on you?" Mr. Carter responded, "no" and lifted his shirt again. Unsatisfied, Officer DelBorrell requested, "[d]o you mind hiking your pants for me real quick?" Mr. Carter complied. "[I]n a single quick motion, [Mr. Carter] hiked his pants [up] by holding them at the waistband with two hands." He "then lifted his shirt [again] and put it back down."

While this was happening, Officer Guzman had begun to approach Mr. Carter from the other group. When he was about six to ten feet away, he noticed a bulge in

Mr. Carter's groin area. When Mr. Carter raised his pants in response to Officer DelBorrell's question, Officer Guzman, from approximately three to five feet away, saw that the bulge was an L-shape, which he believed to be a firearm. Officer Guzman then instructed Mr. Carter to "[s]tand up . . . one more time." Mr. Carter stood. Guzman then remarked, "[r]ight there, brother, right there," pointing to Mr. Carter's right groin area. Mr. Carter replied, "[t]his is my phone," pulling a phone from his right pocket. Officer Guzman subsequently frisked Mr. Carter and after a brief struggle in which the other officers on the scene joined, the officers recovered a firearm hidden in Mr. Carter's pants.

Based on this encounter, Mr. Carter was charged with eight offenses connected to the firearm. He moved to suppress the firearm as well as a statement he made following the incident on grounds that they were the result of an unreasonable seizure in violation of the Fourth Amendment. The trial court denied his motion. It rejected his argument that he was seized when Officer DelBorrell asked him to raise his pants and held that Mr. Carter was seized only after he pulled his pants up. The court held that by then, the officers had reasonable suspicion to seize him based on Officer Guzman's observation of an L-shaped bulge in his groin area that he made only *after* Mr. Carter raised his pants. Accordingly, the court held that the firearm and statement were not the product of an unreasonable seizure.

Mr. Carter was subsequently convicted on all eight counts following a trial on stipulated facts. He timely appealed.

## II.    Analysis

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. U.S. Const. amend. IV. Under the Fourth Amendment's prohibition against unreasonable seizures, law enforcement officers may not seize an individual unless they have reasonable suspicion or probable cause to believe that the person is engaged in criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 27 (1968); *Robinson v. United States*, 76 A.3d 329, 335 (D.C. 2013).

Mr. Carter's sole claim on appeal is that the trial court erroneously denied his motion to suppress. Contrary to the court's holding, he argues that the officers seized him within the meaning of the Fourth Amendment when Officer DelBorrell requested that he raise his pants. Because, according to Mr. Carter, the officers lacked reasonable suspicion or probable cause, such conduct violated his Fourth Amendment rights. Mr. Carter claims that the trial court therefore should have suppressed the fruits of that seizure—the firearm and his subsequent statement. *See Smith v. United States*, 283 A.3d 88, 98 (D.C. 2022) (explaining that a court must generally suppress any evidence "obtained as a direct result of" or "found to be a

derivative of" an illegal search or seizure (quoting *Utah v. Strieff*, 579 U.S. 232, 237 (2016))).

For its part, the government admits that it lacked reasonable suspicion or probable cause to seize Mr. Carter when Officer DelBorrell asked him to raise his pants. It also concedes that if it did seize Mr. Carter at that moment, the firearm and statement were products of an unreasonable seizure and should have been suppressed. The government's sole argument on appeal is that it did not seize Mr. Carter until after Officer DelBorrell's request that Mr. Carter "hike" his pants up, when it did have reasonable suspicion to seize him. Mr. Carter does not deny that the officers had reasonable suspicion after Officer DelBorrell's question and simply argues that the seizure began before then.

Accordingly, the central question before us is whether Mr. Carter was seized when Officer DelBorrell requested that he raise his pants. We review this question de novo. *Sharp v. United States*, 132 A.3d 161, 166 (D.C. 2016) (holding that whether a defendant was seized within the meaning of the Fourth Amendment is a question of law, which we review de novo).

To determine whether a defendant was seized within the meaning of the Fourth Amendment, we ask whether in view of all the circumstances surrounding the defendant's encounter with law enforcement, an objective and reasonable person

in the defendant's shoes would have "felt free to terminate" the interaction and "go about [their] business." *Jones v. United States*, 154 A.3d 591, 592 (D.C. 2017); *see Graham v. Connor*, 490 U.S. 386, 397 (1989) (explaining that the test for reasonableness under the Fourth Amendment is an "objective one"). "Circumstances that might signify a seizure include the 'presence of several officers, the display of a weapon by an officer, some physical touching of the [defendant], or the use of language or tone of voice indicating that compliance with the officer[s'] request[s] might [have been] compelled.'" *T.W. v. United States*, 292 A.3d 790, 795 (D.C. 2023) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). To that list, we have added factors such as whether (1) the officers asked the defendant questions of such an accusatory nature that an objective and reasonable person in the defendant's position would have felt "apprehensive" in failing to reply, *see Jones*, 154 A.3d at 596; (2) the officers continued to press the defendant with such questions "in the face of an initial denial," signaling that they "'refused to accept' the answer given," *T.W.*, 292 A.3d at 795 (quoting *Golden v. United States*, 248 A.3d 925, 938 (D.C. 2021)); (3) the encounter took place at night or the defendant was alone or secluded, *see Dozier v. United States*, 220 A.3d 933, 944 (D.C. 2019); and (4) "the officers . . . blocked the [defendant's] potential exit paths or 'means of egress'" so as to signal that the defendant was not free to leave, *T.W.*, 292 A.3d at 795 (quoting *Golden*, 248 A.3d at 939). In addition, we also consider the defendant's

race and the role that it may have played in affecting their willingness to leave. *See Dozier*, 220 A.3d at 944.

## A.

At the outset, we acknowledge that this is a close case. Whereas several aspects of Mr. Carter's interaction with the officers strongly suggest that he was seized, there are other features that sway us in the opposite direction.

Beginning with the case that favors Mr. Carter, we recognize that this case is not too dissimilar from *Golden*, in which we held that the defendant was seized. *See generally Golden*, 248 A.3d 925. In that case, the defendant, Brandon Golden, was walking alone along a sidewalk at night when four GRU officers in a pair of unmarked SUVs approached him from behind. *Id.* at 931. One of the SUVs stopped at a curb in front of Mr. Golden and the other parked several feet to the left. *Id.* With his window rolled down and his police badge, tactical vest, and firearm clearly visible, an officer in the first car, Officer Vaillancourt, asked Mr. Golden, "in a conversational tone . . . whether he had any weapons on him." *Id.* at 932. Mr. Golden replied that he did not. *Id.* Officer Vaillancourt then asked, "[c]an you just show me your waistband[?]" *Id.* (second alteration in original). Mr. Golden complied by pulling up the middle and left sides of his shirt but not the right. *Id.* Suspecting that Mr. Golden was attempting to conceal something underneath the

right part of his shirt, Officer Vaillancourt continued to probe Mr. Golden about what he was hiding. *Id.* Eventually, Officer Vaillancourt exited the vehicle, frisked Mr. Golden, and discovered a firearm. *Id.* Mr. Golden was subsequently charged with various firearm-related offenses and sought to suppress the firearm on grounds that the officers seized him without reasonable suspicion or probable cause and that the firearm was a product of this unreasonable seizure. *Id.* at 931, 933. The trial court denied his motion and Mr. Golden was convicted. *Id.* at 933.

On appeal, we vacated Mr. Golden's conviction and remanded. *Id.* at 949. We held that the officers in the SUVs seized Mr. Golden the moment Officer Vaillancourt requested to see his waistband. *Id.* at 936. Because the officers lacked reasonable suspicion or probable cause at that point, the seizure was unreasonable. *Id.* at 940. Accordingly, the trial court erred in failing to suppress the firearm. *Id.*

We arrived at the conclusion that Mr. Golden was seized by first recognizing that Mr. Golden's encounter with the officers was not merely one between "equals," which an objective and reasonable person would feel free to terminate, but rather "commenced with an impressive show of police authority." *Id.* at 936 (quoting *Jones*, 154 A.3d at 595). We observed that "[n]ot one but four police officers in two unmarked vehicles simultaneously converged on and partially surrounded [Mr.

Golden], with one of the vehicles blocking his path by stopping directly in front of him[—]a visible signal that the police intended for him to stop." *Id.*

Second, we held that Officer Vaillancourt's immediate questioning of Mr. Golden as to whether he was carrying any weapons was of such an accusatory nature that it could not be viewed as merely "a simple request for information." *Id.* at 937; *cf. Florida v. Bostick*, 501 U.S. 429, 434 (1991) (holding that an officer does not seize someone merely by approaching them and "ask[ing] a few questions"). Rather, it indicated to Mr. Golden that he had been "singled . . . out" because the police "suspected *him* of being armed and committing a crime," thereby contributing to a "sense of powerlessness in an investigative confrontation by the police," one which he could relieve himself of only by demonstrating his innocence. *Golden*, 248 A.3d at 937 (second alteration in original).

Finally, we explained that Officer Vaillancourt's request that Mr. Golden reveal his waistband after Mr. Golden denied carrying a weapon took the interaction "beyond mere questioning," because it "implied" to Mr. Golden that the officers would continue to view him with "heightened suspicion if he attempted to end the encounter without first exposing his waist[band]." *Id.* We held that an objective and reasonable person in Mr. Golden's shoes "would not [have felt] free to frustrate

the police inquiry" without first complying with Officer Vaillancourt's request in order to "allay [his] suspicions" and "get the confrontation over with." *Id.*

Here, Mr. Carter's interaction with the officers bore many of the same features that contributed to our finding that Mr. Golden was seized. First, like in *Golden*, two police vehicles simultaneously approached Mr. Carter and others in his group. Four officers then exited the vehicles and converged on the group, suggesting that the men were not simply free to continue conversing amongst themselves as they were previously. Officer DelBorrell also approached Mr. Carter from behind, which—in our view—would make any objective and reasonable person feel uneasy and intimidated, especially when faced with an openly visible firearm within close proximity.

Second, like Officer Vaillancourt, Officer DelBorrell immediately asked Mr. Carter whether he possessed a firearm. As we did in *Golden*, we view this question as one that suggested to Mr. Carter that he, alongside other members of the group, had been singled out as being suspected of criminal activity. An objective and reasonable person in his shoes would have felt apprehensive in refusing to respond to the officer's question. *See, e.g.*, *Mayo v. United States*, 315 A.3d 606, 628-29 (D.C. 2024) (en banc) (explaining that such a question is intimidating in part due to the "illegal[ity] [of] carry[ing] a gun in the District without proper licensure and

registration"); *T.W.*, 292 A.3d at 796-97 (explaining the coercive nature of a request for a weapon). They may have felt fearful that refusing to answer such a question would have suggested to "the suspicious officer[]" that they had "something to hide." *Guadalupe v. United States*, 585 A.2d 1348, 1360 (D.C. 1991).

Finally, despite Mr. Carter both denying carrying a firearm and raising his shirt not once but twice to reveal his waistband, Officer DelBorrell continued to probe him by asking him to "hik[e] [his] pants up." We see no appreciable difference between this request and that in *Golden* as both required the defendants to continue assuaging the officers' suspicions despite initially denying any wrongdoing. Indeed, both requests implied to the defendants that they would continue to be suspected of criminal activity until the officers stopped asking questions, thereby leaving them with little choice but to respond. *See T.W.*, 292 A.3d at 798 (seeing no meaningful difference between the officer's offer to pat down the defendant and Officer Vaillancourt's request to view Mr. Golden's waistband because both questions were asked after the defendants denied carrying a weapon).

While we recognize the similarities between this case and *Golden*, we also acknowledge two key differences that prevent us from holding that *Golden* controls the outcome here. Most notably, in *Golden*, we placed significant weight on the fact that Mr. Golden was approached at night by four officers in a secluded setting where

there were no bystanders to witness the interaction. *See Golden*, 248 A.3d at 936-37. This not only resulted in a more intimidating atmosphere, but it also heightened Mr. Golden's concern that he was being singled out for criminal activity and would need to comply to dispel that suspicion. *Id.* at 937. Here, in contrast, Mr. Carter was not singled out on his own but rather as a member of a larger group. This likely mitigated Mr. Carter's concern that he alone was being targeted by the police. Further, Mr. Carter was not outnumbered by four officers in a secluded setting at night. Less intimidating, the interaction took place in broad daylight with nine potential witnesses, all occupying the attention of just four officers.

Second, whereas the officers in *Golden* exerted significant control over Mr. Golden's movement by partially surrounding him, thereby signaling that he was not free to leave, the officers here did not restrict Mr. Carter's movement. Rather, as the trial court found in its suppression ruling, Mr. Carter "was not surrounded or hemmed in by the police" and was "more surrounded by those he had been hanging out with." Indeed, unlike in *Golden*, any restriction on Mr. Carter's movement was, at least in part, self-imposed, namely by his decision to lean against a car in the company of others.[3] *See I.N.S. v. Delgado*, 466 U.S. 210, 218 (1984) (holding that

---

[3] We are unpersuaded by the government's additional attempts to distinguish *Golden*. Namely, the government argues that Officer DelBorrell's conduct toward Mr. Carter was less "intimidating" than Officer Vaillancourt's actions toward Mr. Golden. It points to Officer DelBorrell's casual tone, the fact that Mr. Carter did not

seem to be bothered, and that Officer Vaillancourt requested that Mr. Golden "acquiesce in a public unveiling of part of his body" whereas Officer DelBorrell merely asked Mr. Carter to raise his pants.

We disagree with the government that Officer DelBorrell was less intimidating than Officer Vaillancourt. To begin, as we recognized in *Golden*, Officer Vaillancourt's tone was also "conversational." *Id.* at 932. Despite that, we held that his questions were still intimidating due to their accusatory nature. *Id.* at 937. Indeed, we have previously discouraged courts from "attach[ing] undue weight to a police officer's 'conversational' tone in speaking to a suspect." *T.W.*, 292 A.3d at 803 (quoting *Golden*, 248 A.3d at 935 n.26). "While a harsh and commanding tone could certainly convey to a person that their compliance is non-optional, a polite and conversational tone does little to dispel coercion that arises from the content of officers' inquiries, or in how they have approached the suspect." *Id.* at 803; *see also Guadalupe*, 585 A.2d at 1361 (explaining that police questioning does "not have to assume an intensity marking a shift from polite conversation to harsh words to create an intimidating atmosphere"). This is especially true when the officer's inquiries are accusatory in nature, as they were here.

Second, we disagree with the government's characterization of Mr. Carter as being "[un]bothered." Almost immediately after Officer DelBorrell began questioning him, Mr. Carter raised his shirt up twice. If he were unbothered, we think it far more likely that he would ignore the officer's questions or at minimum verbally deny possessing a firearm, let alone take the more drastic step of revealing his waistband. In any case, we place little weight on Mr. Carter's subjective response to Officer DelBorrell's conduct as the Fourth Amendment seizure inquiry is an objective one—that is, whether an objective and reasonable person in Mr. Carter's shoes would feel free to terminate the encounter. *See Jackson v. United States*, 805 A.2d 979, 987 (D.C. 2002).

Finally, that Officer DelBorrell requested that Mr. Carter raise his pants whereas Officer Vaillancourt asked Mr. Golden to reveal his waistband is not legally significant for present purposes. Setting aside the fact that Mr. Carter had already raised his shirt twice before Officer DelBorrell called on him to raise his pants, our main point here in *Golden* was not that Mr. Golden was subject to a highly intrusive inquiry (though he was), it was that the officer indicated to him that he would not be free to leave until he fully satisfied the officer that he did not possess any weapons. *See Golden*, 248 A.3d at 937. Similarly here, by failing to take "'no' for an answer,"

workers in a factory were not seized despite officers being stationed at the factory doors because the workers had already voluntarily limited their movement to the factory floor before the officers arrived).

## B.

In addition to the differences between *Golden* and this case, we previously concluded in two cases—*Brown* and *Kelly*—that defendants in circumstances also not too dissimilar to those here were *not* seized within the meaning of the Fourth Amendment. *See generally Brown v. United States*, 983 A.2d 1023 (D.C. 2009); *Kelly v. United States*, 580 A.2d 1282 (D.C. 1990). In *Brown*, two officers approached a group of "five or six [people] standing on [a] sidewalk." 983 A.2d at 1024-25. One of the officers approached the defendant, Valerie Brown, and asked if she had "any guns, drugs, or narcotics on [her]." *Id.* at 1025. Ms. Brown replied that she was "not doing anything" and that she was just "counting [her] money." *Id.* The officer repeated her question and Ms. Brown "reached into her purse and handed the officer a brown pill bottle," which later tested positive for cocaine. *Id.*

We held that Ms. Brown was not seized despite the fact that the officer asked the same accusatory question twice. *Id.* at 1026. We relied on the fact that the

---

Officer DelBorrell gave Mr. Carter the impression that he would have to respond to all his questions before being let go. *Id.* (alterations in original).

officers were outnumbered by the group Ms. Brown was a part of, the fact that she was approached by only one officer while the other was further away speaking to two other individuals, that the officers did not engage in behavior, "such as threatening gestures, orders, or intimidation, which might have caused the encounter to lose its consensual nature," and that other members of the group walked away unimpeded, suggesting that an objective and reasonable person in Ms. Brown's shoes would have felt free to leave. *Id.* at 1025-26. That the officer asked an accusatory question and that she repeated her question were insufficient to overcome the non-coercive nature of the other aspects of the interaction. *See id.*

In *Kelly*, two officers approached the defendant, James Kelly, at Union Station. *Kelly*, 580 A.2d at 1284. Both officers were in plain clothes and neither was visibly carrying a firearm or displaying their badge. *Id.* One of the officers asked Mr. Kelly if he "could speak with him" and Mr. Kelly replied, "yes." *Id.* Meanwhile, the other officer stood "about four feet in front of Kelly." *Id.* The questioning officer inquired about where Mr. Kelly was arriving from, where he lived, and how long he had lived there. *Id.* The officer then introduced himself as a member of the Narcotics Branch of the police department and asked if Mr. Kelly was "carrying any drugs." *Id.* Mr. Kelly replied, "no." *Id.* The officer then asked to search Mr. Kelly's bag, which Mr. Kelly permitted. *Id.*

Like in *Brown*, we held that Mr. Kelly was not seized despite being repeatedly asked an accusatory question. *Id.* at 1288. We explained that the officer "made no demands" of Mr. Kelly, never produced a weapon, and never touched Mr. Kelly. *Id.* at 1286. Further, we rejected Mr. Kelly's argument that the non-questioning officer was impeding his movement as the officer was four feet away, did not brandish a weapon, or make any threatening gestures. *Id.* Finally, we emphasized that the questioning officer asked Mr. Kelly if he could speak with him, thereby implying to Mr. Kelly that he did not have to comply. *Id.*

*Brown* and *Kelly* suggest that we should similarly overlook the fact that Mr. Carter was repeatedly asked accusatory questions as the other aspects of the encounter were just as non-coercive as in those two cases. Like in *Brown*, Mr. Carter's group far outnumbered the officers who approached them. In fact, the number of non-officers to officers was approximately the same in both cases (five to two). Further, like in *Brown*, Mr. Carter was initially approached by one officer, Officer DelBorrell, while the others focused elsewhere. Indeed, at the time Officer DelBorrell requested that Mr. Carter raise his pants, Officer DelBorrell was the only officer in Mr. Carter's immediate vicinity. Officer Guzman, the next closest officer, was still several feet away. Finally, like in *Brown* and *Kelly*, the officers here did not make any threatening gestures or orders, nor did they touch Mr. Carter, so as to suggest that compliance was mandatory.

The government goes so far as to argue that considering the similarities, *Brown* and *Kelly* control the outcome in this case. While we certainly place analytical weight on both cases, we reject the government's claim that they are controlling. *Brown* is distinguishable for two reasons. First, unlike in *Brown*, no member of Mr. Carter's group left once the police arrived. To the contrary, not only did members of the group comply with the officers' requests, but some went further by raising their shirts before they were even asked. Accordingly, unlike in *Brown*, the behavior of others surrounding Mr. Carter suggest that an objective and reasonable person in his shoes would not have felt free to leave. Second, what made the repetitive questioning less coercive in *Brown* was that Ms. Brown's first answer was non-responsive to the officer's question. The officer asked whether she was carrying any contraband, and rather than replying "yes" or "no," Ms. Brown answered that she was simply counting her money. *Brown*, 983 A.2d at 1025. Thus, it was "entirely reasonable for the officer to ask her question again." *Gordon v. United States*, 120 A.3d 73, 82 (D.C. 2015) (differentiating *Brown* on grounds that the repetitive questioning in *Brown* was simply to seek clarification to a non-responsive initial answer); *T.W.*, 292 A.3d at 801 (same). Here, in contrast, Mr. Carter explicitly denied carrying a weapon and raised his shirt twice when Officer DelBorrell questioned him. In the face of this denial, unlike in *Brown*, Officer DelBorrell implied that he was unsatisfied by asking Mr. Carter to raise his pants.

*Kelly* is also distinguishable. Namely, the officer there requested Mr. Kelly's permission to speak with him before questioning him, thereby indicating that cooperation was only optional. *Kelly*, 580 A.2d at 1284. An acknowledgement that an individual need not comply significantly reduces the coercive nature of a police encounter as it dispels doubt in an individual's mind that they must cooperate to terminate the interaction. Whereas the officer in *Kelly* effectively informed Mr. Kelly of his right to walk away by asking him if he could speak, the officers did not do so here. Officer DelBorrell simply approached Mr. Carter from behind and began asking if he was carrying any weapons.

\* \* \*

In light of the similarities between this case and those in which we both found that the defendant was seized (*Golden*), and not seized (*Brown* and *Kelly*), we must look beyond the mere conduct of the officers to objectively determine whether Mr. Carter was seized. To do so, we examine the impact of the defendant's race. *Dozier*, 220 A.3d at 944. Indeed, in its suppression ruling, the trial court implicitly recognized the relevance of race to its Fourth Amendment seizure inquiry. It acknowledged that "in certain neighborhoods among certain demographics that are highly policed[,] the behavior of police can convey to a reasonable . . . person that they are compelled to allay [the] officers' suspicion by acceding to their wishes."

The court went no further, however, and instead focused its analysis solely on the coercive nature of the officers' conduct. It did not delve further into how the officers' conduct might have uniquely impacted an objective and reasonable person sharing Mr. Carter's racial status as a Black man. Accordingly, in this next part, we conduct a more thorough inquiry.

## C.

*Dozier* requires that in addition to considering the coercive nature of the officers' conduct in a Fourth Amendment seizure analysis, we must also take into account the defendant's race. *Id.* More specifically, we are to consider whether an objective and reasonable person sharing the defendant's generalized lived experiences arising out of their racial status would have felt free to terminate the police encounter. *See id.* at 944-45. Our consideration of the defendant's race recognizes that a Fourth Amendment seizure inquiry would be incomplete, and indeed, incongruent with the objective reality that people of color face during interactions with law enforcement. *Id.* For people of color, and as relevant here, Black men, feel "especially apprehensive" around the police such that conduct that

may not rise to the level of a seizure without consideration of race, may do so once the defendant's race and lived experiences are accounted for. *Id.* at 944.[4]

To inform our analysis as to the role that Mr. Carter's status as a Black man may have played here, it is first important to understand why Black men, generally speaking, are especially cautious around and more likely to comply with the demands of law enforcement. There are two central reasons. First, "[i]t is no secret" that Black Americans are disproportionately likely to be victims of violence at the hands of police officers, particularly during suspicionless investigatory inquiries like the one here. Bloom*, supra* at note 4, at 7 (quoting *Strieff*, 579 U.S. at 254 (2016) (Sotomayor, J., dissenting)). In recent years, nationally, police officers have threatened or used non-fatal force in roughly three percent of encounters they initiated or which resulted from a traffic accident. Nazgol Ghandnoosh & Celeste Barry, *One in Five: Disparities in Crime and Policing* 9 (2023),

---

[4] For a more thorough discussion as to why considering the defendant's race is consistent with the objective nature of the Fourth Amendment seizure inquiry, *see, e.g.,* Daniel S. Harawa, *Coloring in the Fourth Amendment*, 137 Harv. L. Rev. 1533 (2024); Aliza H. Bloom, *Objective Enough: Race is Relevant to the Reasonable Person in Criminal Procedure*, 19 Stan. J. C.R. & C.L. 1 (2023); Lindsey Webb, *Legal Consciousness as Race Consciousness: Expansion of the Fourth Amendment Seizure Analysis Through Objective Knowledge of Police Impunity*, 48 Seton Hall L. Rev. 403 (2018); Devon W. Carbado, *(E)Racing the Fourth Amendment*, 100 Mich. L. Rev. 946 (2002); Tracey Maclin, *"Black and Blue Encounters"—Some Preliminary Thoughts About Fourth Amendment Seizures: Should Race Matter*, 26 Val. U. L. Rev. 243 (1991).

https://www.sentencingproject.org/app/uploads/2023/11/One-in-Five-Disparities-in-Crime-and-Policing.pdf; https://perma.cc/J367-HYVL. During these interactions, Black individuals were over twice as likely to be subject to force or threatened force as White individuals. *Id.* And with regard to fatal force, Black Americans were over twice as likely to be shot and killed by police officers as White Americans. *Id.* Twenty-one percent of Black adults have reported being victims of police violence on account of their race (compared to three percent of white adults) and nearly half have stated that they were at some point fearful for their life around law enforcement (compared to sixteen percent of white adults). Craig Palosky, *Poll: 7 in 10 Black Americans Say They Have Experienced Incidents of Discrimination or Police Mistreatment in their Lifetime, Including Nearly Half Who Felt Their Lives Were in Danger*, KFF (June 18, 2020), https://www.kff.org/racial-equity-and-health-policy/press-release/poll-7-in-10-black-americans-say-they-have-experienced-incidents-of-discrimination-or-police-mistreatment-in-lifetime-including-nearly-half-who-felt-lives-were-in-danger/; https://perma.cc/RR22-LDNJ.

Naturally, this statistical reality has led to the perception among Black Americans, and Black men in particular, that they are unsafe around law enforcement and that they must engage in "particular kinds of performances" around the police to "preempt" and mitigate the risks of "law enforcement discipline."

Carbado, *supra* at note 4, at 966. Indeed, the inundation of countless stories of young and unarmed Black men being killed by police for their failure to comply and generations-worth of experience in dealing with the police within the Black community have led Black parents to give their children "'the talk'—instructing them to never run down the street; always keep [their] hands where they can be seen; [and to never] even think of talking back to . . . stranger[s]—all out of fear of how an officer with a gun will react to them." *Strieff*, 579 U.S. at 254 (Sotomayor, J., dissenting); *see* Rod K. Brunson, *"Police Don't Like Black People": African-American Young Men's Accumulated Police Experiences*, 6 Crim. & Pub. Pol'y 71, 88 (2007) (finding that "violence at the hands of the police . . . happened enough to convince [Black youth] that it was a real possibility during *any* encounter with police officers"); Rayan Succar et al., *Understanding the Role of Media in the Formation of Public Sentiment Towards the Police*, Commc'ns Psych (2024) (describing the influential role of individual media stories of police brutality on perceptions about the police). Having been raised in this environment, and "being more vulnerable to police violence" than other demographic groups, Black men are more likely to comply with police demands rather than exercise their constitutional right to terminate a suspicionless police encounter. *Dozier*, 220 A.3d at 945.

Second, even setting aside the risk of provoking violence, Black Americans are especially distrustful of law enforcement and are thus less likely to terminate a

police encounter due to skepticism that any attempt to exercise their constitutional rights will be respected. From slave patrols during the antebellum era to Black Codes post-Reconstruction to disparate charging and sentencing practices today, the criminal legal system has historically been used as a tool to undermine rather than uphold the freedom and dignity of Black Americans. *See* Daniel S. Harawa, *Whitewashing the Fourth Amendment*, 111 Geo. L.J. 923, 940 (2023); *see generally* Michelle Alexander, *The New Jim Crow* (2010). Modern-day policing reflects this history with Black communities disproportionately subject to adverse police interactions. *See* Radley Balko, *There's Overwhelming Evidence that the Criminal Justice System is Racist: Here's the Proof*, Wash. Post (June 10, 2020), https://perma.cc/ND2K-SUGV (cataloging studies of racial bias in the criminal justice system, including 46 peer-reviewed studies demonstrating racial bias in policing and profiling over the prior five years). Black Americans are more likely to be subject to suspicionless stops and are more likely to be searched and detained during these stops. *Bloom, supra* at note 4, at 7, 13 (citing U.S. Dep't Justice, *Investigation of the Ferguson Police Department* 4 (2015), https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/ferguson_police_department_report.pdf; https://perma.cc/ZBT9-7BJP (concluding that Black drivers were "more than twice as likely as white drivers to be searched during vehicle stops even after controlling

for non-race variables")).  Black men in particular also tend to be questioned more accusatorily and aggressively—a product of both historical tension between law enforcement and the Black community and, as social science research suggests, stereotyping of Black men as being dangerous and criminally predisposed.  Carbado, *supra* at note 4, at 982; Graham Cronogue, *Race and the Fourth Amendment: Why the Reasonable Person Analysis Should Include Race as a Factor*, 20 Tex. J. C.L & C.R. 61 (2015).  That is, whereas a police officer's objective in questioning a White individual will be to simply "check things out," they will often "need more time with and more information from the" Black individual given their perception that the Black individual is more likely to engage in criminal activity.  Carbado, *supra* at note 4, at 982.

It should therefore come as "no surprise" that Black Americans "often perceive their interactions with law enforcement differently than other demographics."  *State v. Spears*, 839 S.E.2d 450, 463 (S.C. 2020) (Beatty, C.J., dissenting).  Eighty-four percent of Black adults have said that in dealing with the police, Black Americans are generally treated less fairly than other demographic groups.  Drew DeSilver et al., *10 Things we Know About Race and Policing in the U.S.*, Pew Rsch. Ctr. (June 3, 2020), https://www.pewresearch.org/short-reads/2020/06/03/10-things-we-know-about-race-and-policing-in-the-u-s/; https://perma.cc/RH4E-D3UA.  Eighty-seven percent have said that the criminal

legal system as a whole treats Black Americans less fairly. *Id.* Such distrust, sown both historically through the use of the criminal legal system to subjugate Black Americans and via biased modern police practices, has produced an objective reality in which Black Americans lack confidence that the police will respect the exercise of their rights. Maclin, *supra* at note 4, at 254. Rather, to avoid suffering physical abuse and criminal consequences during suspicionless police interactions, Black Americans, and Black men in particular, are often left with no other choice but to remain "calm" and "congenial" and comply with the requests of law enforcement. *Id.* at 278.

Applying this understanding as to why Black men are especially apprehensive around police, it is clear that many of the historical features of blue-on-black interaction that have led to this perception were present in Mr. Carter's encounter. First, Mr. Carter was confronted in a predominantly Black area in a group consisting entirely of Black men by GRU officers who were wearing tactical gear and who were visibly displaying their firearms. This alone was likely sufficient to trigger the elevated fear that Black men experience around law enforcement not only because the officers were carrying openly visible firearms but also because their selective targeting reflected a pervasive understanding that the police target Black men and treat them unfairly. Moreover, the GRU (now the VCIT) has a "reputation for [aggression]." *Mayo*, 315 A.3d at 631; *Robinson*, 76 A.3d at 331-32, 339 (noting

GRU's acknowledged "technique" of confronting people on the street, "ask[ing] people if they have a gun," and then "looking for a reaction," including people's "movements" in response to the question (internal quotation marks omitted)); *United States v. Gibson*, 366 F. Supp. 3d 14, 21 (D.D.C. 2018) (describing how the GRU "trawl[s]" certain "neighborhoods asking occupants who fit a certain statistical profile—mostly males in their late teens to early forties—if they possess contraband[ ] [d]espite lacking any semblance of particularized suspicion when the initial contact is made" (quoting *United States v. Gross*, 784 F.3d 784, 789 (D.C. Cir. 2015) (Brown, J., concurring))). It is also known to selectively target Black individuals. *See* Michael G. Tobin, *Metropolitan Police Department Narcotics and Specialized Investigations Division* 5, 20, 26, (2020), https://policecomplaints.dc.gov/sites/default/files/dc/sites/office%20of%20police%20complaints/publication/attachments/National%20Police%20Foundation%20MPD%20NSID%20Report%20September%202020%20Final.pdf; https://perma.cc/S29N-PMF7 (reporting that between August 1, 2019 and January 31, 2020, Black individuals were the subject of over 87% of GRU stops, 91% of arrests, and 100% of use-of-force incidents). Given this background, it should not come as a shock that several of the men in Mr. Carter's group immediately capitulated to the police presence, including Mr. Carter, by raising their shirts despite not being asked to. Indeed, whereas any reasonable person would be fearful of

failing to cooperate under these circumstances, a Black man would be especially cautious here so as to avoid potential physical retaliation.[5]

Second, compounding the already racially charged and coercive environment in which Mr. Carter's interaction with the police took place, Officer DelBorrell accusatorily and repetitively questioned him regarding whether he possessed a firearm. As explained above, Black men already widely believe that police officers disrespect their rights. We view it as likely that Officer DelBorrell's failure to accept Mr. Carter's initial denial triggered a fear that Officer DelBorrell would not permit Mr. Carter to terminate the encounter without first dispelling his suspicions. To avoid prolonging the suspicion, Mr. Carter felt compelled to comply rather than attempt to exercise his constitutional rights.

---

[5] The VCIT and similar police tactical units that engage in large-scale suspicionless investigations are generally distinguishable from those police units that are engaged in what many refer to as community policing activities. Generally speaking, community policing promotes the systematic use of partnerships and problem-solving techniques to proactively address the conditions that give rise to public safety issues. U.S. Dep't Justice, *Community Policing Defined* 1 (2014), https://portal.cops.usdoj.gov/resourcecenter/content.ashx/cops-p157-pub.pdf; https://perma.cc/9GU6-CNH7. Typically, police officers are assigned to particular communities where they get to know and work with community leaders and others to address the immediate conditions that give rise to public safety issues.

## III.  Conclusion

Accordingly, taking into account the coercive nature of the officers' conduct and factoring in the elevated effect that this would have had on an objective and reasonable Black man in Mr. Carter's shoes, we hold that Mr. Carter was seized within the meaning of the Fourth Amendment when Officer DelBorrell requested that he raise his pants.  The combination of the impressive show of authority reflected in the officers' initial approach and the accusatory and repetitive nature of Officer DelBorrell's questioning already resembled a scenario in which we held a seizure took place.  Compounding the compulsive effect of the police tactics here was that they were used against a man for whom, by virtue of his race and lived experiences, it would have been objectively reasonable to be apprehensive around police officers.  Given the facts of this case, we believe that such apprehension would have led an objective and reasonable Black man in Mr. Carter's shoes to feel as though he had to comply with the officers' demands rather than terminating the encounter.  For this reason, we are satisfied that Mr. Carter was seized when Officer Delborrell disbelieved his initial response, and further requested that he raise his pants.  Because this seizure was not based on reasonable suspicion or probable cause, it was unreasonable and violated the Fourth Amendment.  The trial court thus erred in failing to suppress the fruits of the seizure—the firearm and Mr. Carter's later statement.

For the foregoing reasons, we vacate Mr. Carter's convictions and remand for further proceedings.

*So ordered.*

McLEESE, *Associate Judge*, concurring in the judgment: The opinion for the court holds that Mr. Carter was unlawfully seized. *Ante* at 30. I respectfully concur in the judgment.

As the opinion for the court notes, the key facts are undisputed: (1) in public and during the daytime, a group of five officers approached a group of ten men that included Mr. Carter; (2) one of the officers asked Mr. Carter how he was doing; (3) Mr. Carter lifted his shirt to show his waistband; (4) the officer asked if Mr. Carter had "nothing" on him; (5) Mr. Carter responded no and lifted his shirt again; and (6) the officer asked if Mr. Carter "mind[ed] hiking [his] pants for me real quick?" *Ante* at 2-4.

Describing the case as "close," *ante* at 9, the opinion for the court appears to give dispositive weight to an additional consideration: that Mr. Carter as a Black man would reasonably be "especially apprehensive around police" and "especially distrustful of law enforcement," *ante* at 24, 27, and therefore would reasonably have felt obliged to comply with the officer's request to hike up his pants, *ante* at 30.

In support of the conclusion that Mr. Carter's race is properly considered in determining whether Mr. Carter was seized, the opinion for the court relies on this court's decision in *Dozier v. United States*, 220 A.3d 933 (D.C. 2019). I concurred in the judgment in *Dozier*. *Id.* at 948-51 (McLeese, J., concurring in the judgment). Among other things, I expressed uncertainty as to whether the race of a suspect can permissibly be considered in assessing whether police conduct constitutes a seizure. *Id.* at 950-51 (citing conflicting authority on issue). The opinion for the court in *Dozier* held, however, that Mr. Dozier's race should be so considered. *Id.* at 943-45. That holding is binding on me. *E.g.*, *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).

Taking as a given that Mr. Carter's race may properly be considered, I agree with the conclusion of the opinion for the court that, although this is a close case, Mr. Carter was seized. *Ante* at 9, 30. I therefore respectfully concur in the judgment.